**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

**JEFFREY COOPER,**                       )
                                          )
     **Appellant,**                    )
                                          )
         **v.**                  )        **Case No. 1:05cv918**
                                          )
**GGGR INVESTMENTS, LLC**                 )
                                          )
     **Appellee.**                    )

**MEMORANDUM OPINION**

This bankruptcy appeal  arises from a combined core/non-core adversary proceeding in

the bankruptcy court in which a debtor sought to set aside a conveyance of his home, or

alternatively, to recover damages on grounds of fraud and violations of the Virginia Consumer

Protection Act (VCPA), Va. Code §59.1-200, et seq.  Specifically at issue are the following three

questions:

    1.      whether the VCPA requires a showing of reliance;

    2.      whether the bankruptcy court correctly found that the debtor had not

          shown reliance required for recovery under the VCPA; and

    3.      whether a conveyance of property is void *ab initio* or simply void where,

          as here, the conveyance is signed after the order dismissing the bankruptcy

          case is signed, but before that order is entered on the docket.

**I.**[1]

Debtor, Jeffrey Cooper, filed a voluntary petition seeking adjudication under Chapter 13

---

[1]These facts are derived from the bankruptcy court's findings of fact as well as the
transcript of the trial in the bankruptcy court.

of the Bankruptcy Code.  A plan was provisionally confirmed subject to the outcome of this case. Pursuant to this plan, unsecured creditors would receive a 100% payout over a period of 36 months.  Any damages recovered in this case must be turned over to the estate for payment of allowed claims.

This is the debtor's third bankruptcy case in approximately five years.  The first, a 2000 Chapter 7 case, culminated in Cooper's receipt of a discharge.  The second, a Chapter 13 case filed in September 2001, culminated in the confirmation of the plan referred to above.  At the time of the plan's confirmation, Cooper lived in a home located at 1672 Barnstead Drive, Reston, Virginia that he had purchased in 1998.

After the plan was confirmed Cooper fell behind in his mortgage payments to Chase Manhattan Mortgage Corporation ("Chase").  In response, Chase sought relief from the automatic stay to pursue foreclosure.  In the end, Chase's motion for relief from the stay was resolved by an agreement, embodied in a consent order requiring that the stay remain in effect on the condition that Cooper cure the mortgage payment arrearages in six months.  Cooper testified that this would be "doable" but "tight," and would require a second job, family aid, or both.

During this six month period, Cooper received a number of unsolicited offers to purchase the property.  He did not respond to these offers because he wished to continue to live in the house.  At one point, however, Cooper did respond to a mail solicitation on the letterhead of a company identified as Berner Group LLC and signed by Nicholas Berner.[2]  The essential portions of this letter read as follows:

---

[2]Neither Cooper nor Berner retained a copy of this letter, but the parties agree that the letter Cooper received was essentially identical to letters written by Berner to other debtors in bankruptcy proceedings, copies of which were produced and admitted as trial exhibits.

> With no obligation on your part, I can share some insights into how we might be able to help you.  These could include covering back mortgage payments, several homeownership options and the like.  We make no guarantees but there is little if any risk on your part and a significant amount of potential upside if we can structure a mutually agreeable arrangement.  We will work with your legal counsel as needed to ensure that your interests are protected.

Although the letter was sent on the Berner Group LLC letterhead, Mr. Berner testified that he was acting at all times as an agent of GGGR Investments, LLC ("GGGR"), in which he held a one-third equity interest.[3]

Cooper responded to the letter by calling Berner and arranging a meeting to discuss possible options.  At the meeting, which took place on October 15, 2003, Berner discussed two possible options with Cooper.  The first, an outright sale of the property, was rejected by Cooper.  According to Cooper, the second option was that the Berner Group would bring the mortgage payments current and Cooper would be given one year to refinance the property and repay the Berner Group double the amount it had advanced.  The real estate agent present at this meeting informed Cooper that the property was worth approximately $260,000.

Notwithstanding the language contained in the letter, that "we will work with your attorney," neither Berner nor any other representative of GGGR discussed the details of the transaction with Cooper's bankruptcy counsel, nor did Cooper's bankruptcy counsel ever inquire into the terms of the transaction or indicate that he did not know Berner.  It also appears that Cooper never asked Berner or any representative of GGGR or the Berner Group LLC to review any proposed transaction with an attorney designated by Cooper.

---

[3]GGGR is not mentioned in the body of the letter, although in the copy produced by Berner at his deposition, the legend "GGGR Investments, LLC" appears in small print at the bottom of the page.

In any event, Cooper decided by November 2003 that the Berner Group's proposal was preferable to the terms of the then-effective consent order with Chase.  In order to allow the transaction with GGGR to proceed, Cooper instructed his bankruptcy counsel to seek voluntary dismissal of the bankruptcy case.  Accordingly, an order dismissing the bankruptcy filing was signed on November 19, 2003, but not entered on the case docket until the following day.  *See* November 20, 2003 Order, Case No. 01-13590-SSM (Bankr.E.D.Va. 2003).

On the same day that the dismissal order was signed, November 19, 2003, Cooper appeared in the offices of GGGR's real estate and bankruptcy attorney, Stephen K. Christenson, to close the transaction with Berner.  At this point in time, the clerk's office had confirmed to Christenson's staff that the order dismissing the case had been signed, and Christenson assumed that the dismissal was effective.  Cooper was then presented with a number of documents setting forth the details of the transaction.  These documents were titled: "Sales Contract," "Deed of Bargain and Sale," "Residential Lease Agreement with Option to Purchase," "Memorandum of Option," "Seller's Receipt" and "Statement of Purchase."  They described a transaction whereby Cooper would sell his home to GGGR for $150,032.32, subject to the Chase deed of trust in the amount of $130,032.32 which GGGR would not assume.  Of the $20,000 in "cash consideration," $15,664.27 was to be paid directly to Chase to cover the arrearages and the remaining $3,814.23 was to be paid to Cooper.  In turn, GGGR was to lease the property back to Cooper for 12 months at $1,442 per month and grant Cooper a nonassignable option to repurchase the home for $178,000.[4]  This option would expire on November 18, 2004.

---

[4]In discussing the transaction, the bankruptcy court stated as follows:

The addendum clarified what may have already been implicit, that

Berner had not mentioned the involvement of GGGR in the transaction, nor did he disclose his one-third ownership interest in GGGR, until the day the deal was signed. Nevertheless, Christenson testified that on that day he explained fully the terms of the agreement to Cooper, and, in particular, explained to Cooper that the deed to the property would be recorded to protect the interests of GGGR and that the memorandum of option would be recorded to protect the interests of Cooper.  Christenson then left the room to allow Cooper time to consider the proposed transaction.[5]  Cooper testified that when Christenson left the room, Berner assured him that the deed would not be recorded unless the debtor defaulted on the payments to GGGR. Berner denies making this representation.  The bankruptcy court found that the parties were equally credible on this point, but held that because Cooper had the burden of proof, he could not prevail on this factual issue.  In the end, Cooper signed all of the documents, and both the deed and the option were recorded the next day.[6]

As part of the agreement, Cooper authorized GGGR to draft his checking account each month for the $1,442 lease payment.  Of this amount, $1,122.57 would be used to make the

---

all the debtor was required to do was to come up with enough money to repay GGGR twice its investment and GGGR would then have been out of the deal, and that was apparently the way one of the persons who exercised the purchase option did it.

[5]Christenson testified that he had prepared closing documents for three similar transactions involving GGGR and that on two occasions, the owners, after reviewing the terms of the transaction, had decided not to pursue the transaction.

[6]The deed of trust securing Chase had a due-on-sale clause which required Cooper to pay the balance of the mortgage upon a sale of the property.  Despite this provision, Berner suggested in a later email to Cooper that there was "[n]o need to give [Chase] any details about our arrangement."  Chase, it appears, was not provided notice of the transaction and the record does not disclose whether Chase has ever taken any action in this regard.

mortgage payments to Chase.  The parties dispute the purpose of the remaining $300 premium, and it is not specified in any of the documents.  Cooper testified that he was told that $225 would be used to cover Cooper's past and future homeowners' association dues, with the remaining $75 as an administrative fee for GGGR.  Berner testified that there was no understanding as to past due homeowners' association dues, and that $150 per month would be used to pay the ongoing dues, and the remaining $150 per month would be considered an administrative fee for GGGR. The bankruptcy court did not resolve this factual dispute, concluding correctly that it was not material to the dispositive questions presented.

In any event, one of the two homeowners' associations, which had obtained a judgment against Cooper in 2001 for delinquent dues, garnished Cooperr's bank account in April 2004.  As a result, several checks presented against this account, including the preauthorized draft in favor of GGGR bounced.  Cooper and GGGR then signed an addendum to the residential lease agreement on June 28, 2004 reciting that GGGR would advance additional sums on the debtor's behalf to cure the $3,565.24 in arrearages to the two homeowners' associations.  In return, the option purchase price was adjusted from $178,000 to $183,000 "to cover new advances in costs." The addendum clarified that the option purchase price represented the difference between the option price and the then-current mortgage principal plus any additional costs paid by GGGR.

During the bankruptcy court adversary proceeding, Berner testified that of the four sale, lease-back transactions in which GGGR had been involved, two homeowners had successfully exercised the purchase option, one of whom was given additional time to arrange financing. Cooper, however, was not able to obtain financing.  In April 2004, Cooper began exploring options to refinance the Chase mortgage in order to pay off GGGR.  In May 2004, he received

preliminary loan approval from a mortgage broker named 1-2-3 Loan, LLC ("1-2-3 Loan").

Cooper had represented in the loan application to 1-2-3 Loan that he was the owner of the

property, but 1-2-3 Loan quickly determined that the property was not titled in Cooper's name

and notified Cooper that this prevented approval of his loan.  Cooper testified that this was the

first time he learned that the deed to GGGR had been recorded and that the property was no

longer in his name.

Although GGGR agreed to place a deed reconveying the property to the debtor in escrow

in order to facilitate the transaction, 1-2-3 Loan refused final approval of the loan without record

title in Cooper's name.  An expert called during the bankruptcy proceeding testified that the

structure of the initial transaction between Cooper and GGGR would have made it difficult for an

applicant with Cooper's credit history to obtain financing for two reasons.  First, because the

property would not be titled in Cooper's name, the loan would be treated as a purchase loan, not

a refinancing, and would therefore need to meet the more stringent underwriting standards

applicable to purchase loans.  Second, the fact that the loan was needed to repurchase a property

sold by Cooper less than a year earlier would raise significant red flags for any possible lender.

As a result of his inability to secure refinancing, Cooper instituted an adversary

proceeding in the United States Bankruptcy Court against GGGR, the Berner Group LLC, and

Nicholas Berner.  The complaint, consisting of four counts, alleged the following: (i) a fraudulent

conveyance under 11 U.S.C. § 547, (ii) violations of the VCPA, (iii) common law fraud, and (iii)

a void transfer of property in violation of the automatic stay, 11 U.S.C. § 362.  The Chapter 13

Trustee joined in the action as a nominal party-plaintiff in order to provide standing with regard

to the fraudulent conveyance count.  The complaint prayed for the avoidance of the transfer of

real property, and money damages against all of the defendants pursuant to the VCPA and

common law fraud claims.  Defendants filed a counterclaim against Cooper for his alleged fraud

in misrepresenting his intent to perform his contracts with GGGR, and brought a separate motion

for relief from the automatic stay in order to bring a state court action against the debtor for

possession of the property.  Because the adversary proceeding and the motion for relief from the

stay involved common facts, the bankruptcy court combined the hearing on the motion with the

trial of the adversary proceeding.

After conducting a trial, the bankruptcy court entered judgment for the defendants on all

counts.  With regard to Count One, which has not been appealed, the bankruptcy court found that

the plaintiff's claim of fraudulent conveyance failed because it found that Cooper received

reasonably equivalent value in exchange for the transfer of the property[7] and that Cooper did not

become insolvent as a result of the transfer.

The bankruptcy court then addressed Cooper's claim for common law fraud.  In order to

prevail under a theory of common law fraud, a plaintiff must show by clear and convincing

evidence, the following elements: (1) A false representation; (2) of material fact; (3) made

intentionally and knowingly; (4) with intent to mislead; (5) reliance by the aggrieved party; and

(6) resulting damages.  *See Bryant v. Peckinpaugh*, 241 Va. 172, 175, 400 S.E.2d 201, 203

---

[7]In this regard the bankruptcy court reasoned that Cooper's option to purchase the property was worth $82,000, the difference between the estimated value of the property ($260,000) and the option price ($178,000).  The bankruptcy court added this figure to the $20,000 in cash compensation received by Cooper and compared this figure ($102,000) to the value of Cooper's equity ($129,968).  The fact that Cooper received 78% of the fair market value for his home in an arm's length transaction, in which the bankruptcy court found that the transferee had acted in good faith, was sufficient to allow the bankruptcy court to find that Cooper had received reasonably equivalent value for his property.

(1991).  With respect to this fraud claim, Cooper alleged that Berner made two

misrepresentations.  First, Cooper alleged that the transaction was misrepresented as a loan when

it was in fact a sale with an option to repurchase.  Second, Cooper alleged that Berner

misrepresented that the deed would not be recorded unless there was a default when in fact

Berner always intended to record the deed.  With respect to the first allegation, the bankruptcy

court found that plaintiff failed to carry his burden of proof because the testimony of Christenson

to the effect that he explained the terms of the agreement to Cooper, coupled with the fact that

Cooper was provided with the transaction documents themselves, demonstrated that the nature

and terms of the transaction were well known to Cooper before he consummated the transaction

with GGGR.  As for the disputed conversation between Berner and Cooper, where Berner

allegedly told Cooper that he would not record the deed absent a default, the bankruptcy court

found that Cooper failed to carry his burden of proof on this fact.  Thus, the bankruptcy court

held in favor of the defendants on Cooper's claim of common law fraud.

The bankruptcy court next addressed Cooper's VCPA claim finding that two of the

VCPA's prohibitions were potentially at issue: VCPA § 200(a)(5) which prohibits

"[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients,

uses, or benefits," and the VCPA catch-all provision, § 200(a)(14), which prohibits the use of

"any other deception, fraud, false pretense, false promise, or misrepresentation in connection

with a consumer transaction."  With respect to the claim that Berner had not revealed that he was

acting on behalf of GGGR, in which he held an equity interest, until the day the documents were

signed, the bankruptcy court held in favor of defendants because it found that Cooper had not

relied on the name of the company when he made his decision to engage in the transaction, and

that "in the absence of reliance, [the Court] cannot find that the debtor would be entitled to recover under the [VCPA]."  With respect to Cooper's claim that Berner had promised not to record the deed absent a default, the bankruptcy court found, as noted, that Cooper had not carried his burden of proof that this statement was made, even under a preponderance of the evidence standard.  Finally, in regards to the initial solicitation's assurance that GGGR would "work closely with your attorney to protect your rights," the bankruptcy court found that Cooper knew that his bankruptcy attorney had not worked closely with GGGR before he signed the documents or had his case dismissed and that, therefore, there was no reliance.  According to the bankruptcy court, to prevail in a VCPA claim, "[t]here must be a misrepresentation that is relied upon."

Finally, the bankruptcy court addressed Cooper's contention that the transfer of his home the day before the dismissal order was docketed violated the automatic stay required by 11 U.S.C. § 362(a)(3).[8]  In this respect, the bankruptcy court held first that the property was not part of the bankruptcy estate because the debtor's plan had already been confirmed pursuant to 11 U.S.C. § 1327(b) and that this confirmation vested all property of the estate in the debtor. Because the property was no longer part of the bankruptcy estate, its transfer could not violate the automatic stay.  In the alternative, the bankruptcy court held that even if the property were part of the bankruptcy estate, acts in violation of the stay are voidable, not void, and that "the circumstances here would not justify setting aside the transfer for what amounts, at best, to a

---

[8]This provision provides, in pertinent part, that the filing of a bankruptcy case "operates as a stay, applicable to all entities, of . . . any act to obtain possession of a property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

technical and unintended violation of the automatic stay."

In resolving GGGR's claims, the bankruptcy court found for Cooper on GGGR's counterclaim citing the total lack of evidence that Cooper entered into the contracts with GGGR not intending to perform.  The bankruptcy court also found that because the property properly belonged to GGGR, that Cooper was a tenant at sufferance.  Accordingly, it granted GGGR's motion to terminate the automatic stay in relation to the real property and allowed GGGR to pursue an action for possession.

Cooper appealed this decision as to all counts, but the Chapter 13 trustee declined to join in the appeal.  As a result, on August 17, 2005 the bankruptcy court entered an order limiting Cooper's appeal to those counts in which Cooper alone has standing, namely: violations of the VCPA, common law fraud, and the alleged violation of the automatic stay.

## II.

A bankruptcy court's findings of fact are subject to review under a "clearly erroneous" standard, as provided for in Rule 8013, Fed. R. Bankr. P., whereas conclusions of law are subject to *de novo* review.  *See In re Johnson*, 960 F.2d 396, 399 (4th Cir. 1992) (citing *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988); *In re Crouthamel Potato Chip Co.*, 786 F.2d 141, 144 (3d Cir.1986)).

This appeal presents three questions:

1.  whether the bankruptcy court correctly concluded that reliance is required by the VCPA;

2.  whether the bankruptcy court correctly concluded that Cooper did not rely on any misrepresentations made by Berner; and

3.  whether the bankruptcy court correctly concluded that the transfer of the

-11-

real estate to GGGR did not violate the automatic stay provision of 11

U.S.C. § 362.

The first and third questions are questions of law, which are reviewed here *de novo*.  The second

question is one of fact and the bankruptcy court's conclusions in this regard are reviewed here

pursuant to the more deferential "clearly erroneous" standard.

## III.

## 1. Is Reliance Required by the VCPA?

Analysis of whether the VCPA requires a showing of reliance properly begins with the

statutory text and must end there if that language is clear and unambiguous in this respect.  *See*

*Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir.2001) (citing *Caminetti v. United States*, 242 U.S.

470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).  If the statutory text does not address the question

or is less than plain and unambiguous in doing so, it is appropriate to consult the statute's

structure and purpose to resolve the question.  *See U.S. Army Engineer Center v. Federal Labor*

*Relations Authority*, 762 F.2d 409, 416 (4th Cir. 1985).  The VCPA prohibits specific "fraudulent

acts or practices committed by a supplier in connection with a consumer transaction" which are

set forth in forty-four numbered paragraphs, the following three of which are most pertinent here:

> 5. Misrepresenting that goods or services have certain quantities, characteristics,
> ingredients, uses or benefits;
> . . .
> 8. Advertising goods or services with intent not to sell them as advertised, or with
> intent not to sell at the price or upon the terms advertised;
> . . .
> 14. Using any other deception, fraud, false pretense, false promise, or
> misrepresentation in connection with a consumer transaction.

Va. Code § 59.1-200(A).  While VCPA § 200 does not explicitly mention reliance, that does not

end the analysis because a separate VCPA provision speaks directly to this point.  Section 59.1-204, which creates a private cause of action for VCPA violations, provides, in pertinent part, that "[a]ny person who suffers loss as the result of a violation of this chapter shall be entitled to initiate an action to recover actual damages, or $500, whichever is greater."  Thus, in order for a claimant to recover for a VCPA violation, his loss must be the result of, that is caused by, the violation.  And, of course, this causal connection cannot exist without the consumer's reliance on the misrepresentation.

Although the Supreme Court of Virginia has not yet squarely addressed this question, other courts in Virginia have done so, holding consistently that reliance is required to establish a VCPA claim.[9]  As another court in this district put it, "[i]n order to sustain a claim under the VCPA, a plaintiff must prove that the defendant acted with an intent to deceive or otherwise mislead, i.e., with fraudulent intent, as to a material fact *on which the plaintiff relied to his detriment* and which resulted in measurable damages."  *Padin v. Oyster Point Dodge*, 2005 WL 2218898, *7 (E.D.Va. 2005) (emphasis added). Similary, in *Mock v. Boczar*, 64 Va. Cir. 260 (Va. Cir. Ct. 2004), a Virginia circuit court held that a contractor's misrepresentation that he had a Class B contractor's license did not give rise to a claim under the VCPA because the plaintiffs could not show that they entered into the contract "solely because he was licensed," and that, in

_____

[9]*See, e.g., Shirland Arms Corp. v. Hall Const., Inc.*, 2005 WL 1125656, *1 (Va. Cir. Ct. 2005) (concluding that VCPA claims, like common law fraud claims, require reliance)*; Reed v. Litton Loan Servicing LP*, 2004 WL 1386314, *2 (Va. Cir. Ct. 2004) (same); *Weiss v. Cassidy Development Corp.*, 2003 WL 22519650, *2 (Va.Cir.Ct. 2003) ("Allegations of misrepresentation of fact [under the VCPA] must include the elements of fraud: a false representation, of material fact, made intentionally and knowingly, with intent to mislead, *reliance by the party misled*, and resulting damage.") (emphasis added).

any event, his lack of a license did not cause the plaintiffs any actual damage. *Id.* The lesson of all these cases is that the VCPA requires a claimant to show reliance.

Cooper opposes this conclusion, contending that given the language of the preamble of VCPA § 200, any violations of VCPA § 200(A)(1) - (13) are per se unlawful. From this, he argues that reliance is not required. This contention is unpersuasive; its narrow focus on the § 200 preamble is myopic, as it ignores § 204. To be sure, the preamble of VCPA § 200(A) provides that "[t]he following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful." But the fact that the commission of a prohibited act may be unlawful does not, by itself, entitle any claimant to a remedy, as VCPA § 204 clearly requires a claimant to show that the commission of the prohibited act caused a loss. This causation requirement cannot be satisfied absent reliance. Nor is this reliance requirement inconsistent with the § 200 preamble language; the listed practices are indeed *per se* unlawful and the Attorney General of Virginia may enjoin those prohibited acts without demonstrating any reliance by consumers resulting in a loss.[10] Unlike the Commonwealth, however, a private claimant, like Cooper, is not entitled to damages, either actual or statutory, unless he can demonstrate loss caused by the unlawful practice which, of course, necessarily requires a

_____

[10]Va. Code § 59.1-203(A) provides that:

> Notwithstanding any other provisions of law to the contrary, the Attorney General, any attorney for the Commonwealth, or the attorney for any city, county, or town may cause an action to be brought in the appropriate circuit court in the name of the Commonwealth, or of the county, city, or town to enjoin any violation of § 59.1-200. The circuit court having jurisdiction may enjoin such violations notwithstanding the existence of an adequate remedy at law. In any violation under this section, it shall not be necessary that damages be proved.

showing of reliance.

Nor is Cooper's argument based on paragraph 8 of VCPA § 200 persuasive.  Cooper

likens this paragraph, which prohibits "advertising goods or services with intent not to sell them

as advertised, or with intent not to sell at the price or upon the terms advertised," to a prohibition

of a "bait and switch" tactic.  He argues that consumers are not required to show reliance to

recover under the VCPA for a prohibited "bait and switch" practice.  This argument, however,

fails to appreciate the clear language of § 204, which requires that the prohibited practice cause

the loss.  This requirement is as true for paragraph 8 as it is for the other prohibited practices, and

is in no way altered by the fact that it concerns advertising.

In sum, the VCPA's plain language as consistently construed by the courts, requires that a

private VCPA claimant show that he relied on the alleged misrepresentations claimed to

constitute the prohibited practice, and thus that his loss was caused by the prohibited practice.

Accordingly, the bankruptcy court correctly concluded that Cooper was required to prove

reliance on the alleged misrepresentations to recover under the VCPA.

**B. Was there Reliance in this Case?**

Cooper argues that even assuming the VCPA requires a showing of reliance, the

bankruptcy court nonetheless committed clear error when it found that the he did not

detrimentally rely on any of the alleged misrepresentations in agreeing to the transaction.  In this

regard, the bankruptcy court identified the following alleged misrepresentations by Berner: (1)

the absence of any mention of GGGR in the initial solicitation, and the related failure to disclose

Berner's interest in GGGR until settlement; (2) the purported assurances given by Berner that the

deed would not be recorded unless Cooper defaulted on a payment; and (3) the assurance in the

initial solicitation that Berner would work closely with Cooper's bankruptcy counsel.  In addition, Cooper argues that the original solicitation's statement that the Berner Group LLC would structure a transaction that posed "little if any risk" to Cooper was a misrepresentation upon which he relied.  As to each of these alleged misrepresentations, it is necessary to determine whether the statement was in fact made and is prohibited by a provision of VCPA § 200, and if so, whether the misrepresentation was relied upon by Cooper in his decision to enter into the transaction with GGGR.   As noted, the bankruptcy court's conclusions as to these factual questions are accepted as true unless clearly erroneous.

The bankruptcy court found that the failure to disclose the interests of GGGR until settlement, and the failure of Berner to disclose his interests in GGGR was, in fact, a misrepresentation, but that there was "no evidence before the Court of any reliance by the debtor on the identities either of the Berner Group or GGGR."  The solicitation's use of the name Berner Group LLC when GGGR was the real party in interest, violates VCPA § 200(A)(1)'s prohibition against "misrepresenting goods or services as those of another," or, as the bankruptcy court found, VCPA § 200(A)(14)'s general prohibition against "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  As the bankruptcy court noted, however, this was not a situation "where someone was lured to a business by the use of a well-known name and suddenly found themselves dealing with someone they had never heard of before."  During trial, Cooper did not contend that the use of the Berner Group, LLC in the solicitation or the failure to disclose Berner's interest would have affected his decision, nor does he do so in this appeal.  Therefore, the bankruptcy court's factual finding that Cooper did not rely on the misrepresented identity of the organization with

whom he was doing business is not clearly erroneous.

The next alleged misrepresentation made by Berner concerned the nature of the transaction, and specifically whether the transaction would be structured as a loan, or as a sale with an option to repurchase.  As the bankruptcy court correctly noted, Cooper, prior to consummating the deal, was furnished with all the transaction documents, which on their face, plainly described the nature of the transaction as a sale with a lease-back and an option to repurchase.  The record also reflects, without contradiction, that the documents were correctly explained to Cooper by Christenson.  Given this record, therefore, there is no basis for finding clearly erroneous the bankruptcy court's finding that no misrepresentation occurred with respect to the nature of the transaction.

More particularly in this regard, the bankruptcy court focused on one specific alleged misrepresentation concerning the nature of the transaction, namely Berner's alleged representation made to Cooper just before Cooper signed the documents that GGGR would not record the deed unless Cooper defaulted on a payment.  The issue with respect to this allegation is not whether Cooper relied upon Berner's representation, but whether such a representation was ever made.  In this respect, the bankruptcy court determined that under either the "clear and convincing" standard normally required for allegations of fraud, or the ordinary civil standard of "preponderance of the evidence" Cooper had failed to carry his burden of proof that this statement was ever made.[11]  Thus, the question whether Cooper relied on this alleged

---

[11]As the bankruptcy court explained:

> At bottom, I have testimony by two persons, neither of whom I
> have any basis to disbelieve, who testified to two entirely different
> views of what happened at the closing.  Frankly, it isn't even

misrepresentation need not be reached, because the bankruptcy court found that Berner had failed to prove that this misrepresentation was ever made.  As this finding depends on the bankruptcy court's careful weighing of the testimony of two witnesses, it is not to be disturbed unless shown to be clearly erroneous.[12]  No such showing has been made.

The final alleged misrepresentation identified by the bankruptcy court is Berner's pledge to Cooper in the solicitation letter that he would "work closely with [Cooper's] attorney to protect your rights."  Unlike the alleged misrepresentation involving the recording of the deed, the bankruptcy court did find that this was, in fact, a misrepresentation, but, based its holding of no liability on Cooper's lack of reliance on this statement.  According to the bankruptcy court, Cooper knew before he signed any papers, and significantly, before he asked his bankruptcy counsel to dismiss the case, that his bankruptcy counsel had not discussed the transaction with Berner.  Despite this undisputed fact, Cooper did not ask his counsel to review the transaction, nor did he ask Berner to discuss the transaction with his counsel.  In short, Cooper was well

---

necessary to believe that somebody is not telling the truth in the sense of intentionally misrepresenting.  Certainly one of the things any lawyer or judge has experienced over years is that two perfectly honest people can witness an event or listen to a conversation and come away with a different memory of what was said.  That's simply in the nature of human interactions.  We all bring to every event we witness our own expectations and outlooks which can reflect the way we remember even honestly what happened there.

But in any event, even if the standard of proof here is not clear and convincing but is merely by preponderance of the evidence, the fact that the evidence is in equipoise and the fact that the plaintiff here has the burden of proof means that the plaintiff cannot prevail.

[12]*See* Rule 8013, Fed. R. Bankr. P. ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.").

aware before he took any steps to have his case dismissed, and before he signed the documents

on November 19, 2003 that his bankruptcy counsel and Berner had not consulted or worked

together on the transaction. *See* April 14, 2005 Transcript p. 98-99. Nevertheless, Cooper

elected to proceed with the transaction. This evidence convinced the bankruptcy court that:

> before he committed himself by signing a single piece of paper, the debtor was
> fully aware that in fact these folks had not worked with [his bankruptcy counsel]
> on the transaction; and since he knew that, I cannot find the element of reliance
> which is required to sustain a fraud type of action.

May 25, 2005 Transcript, p. 37, lines 19-24. This finding is confirmed by the testimony of

Cooper's bankruptcy counsel and is therefore not clearly erroneous.

Finally, Cooper alleges that the original solicitation's statement that the transaction would

involve "little if any risk" was a misrepresentation upon which Cooper relied when he transferred

his property. Whether Cooper relied upon this statement need not be addressed, however,

because, as the Supreme Court of Virginia has made clear:

> it is well settled that a misrepresentation, the falsity of which will afford ground
> for an action for damages, must be of an existing fact, and not the mere expression
> of an opinion. The mere expression of an opinion, however strong and positive
> the language may be, is no fraud.

*Lambert v. Downtown Garage, Inc.,* 262 Va. 707, 712, 553 S.E.2d 714, 717 (2001) (quoting

*Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 110-11, 540 S.E.2d 134, 142 (2001)). As

to what constitutes an opinion, it is clear that "[c]omendatory statements, trade talk, or puffing do

not constitute fraud because statements of this nature are generally regarded as mere expressions

of opinion which cannot rightfully be relied upon, at least where the parties deal on equal terms."

*Id.* at 713 (quoting *Tate v. Colony House Builders*, 257 Va. 78, 84, 508 S.E.2d 597, 600 (1999)).

In *Lambert*, the Supreme Court held that a mechanic's statement that a used automobile

which had been involved in an accident was in "excellent condition" was "a matter of opinion in the manner of puffing." *Id. See also, Tate*, 257 Va. at 84, 508 S.E.2d at 600 ("highest quality"); *Henning v. Kyle*, 190 Va. 247, 252, 56 S.E.2d 67, 69 (1949) ("good condition"). Likewise, the statement contained in the solicitation letter sent to Cooper that "[w]e make no guarantees but there is little if any risk on your part and a significant amount of potential upside if we can structure a mutually agreeable arrangement," cannot be regarded as a statement of fact, but is merely an act of puffery.

The record here clearly demonstrates that Berner sent similar letters to all prospective clients without knowledge of their particular financial circumstances, or the specific terms of the proposed transaction, and, therefore, the letter could not seriously be regarded as a representation of the risk of the transaction. The fact that Cooper did not specifically mention this statement in his trial testimony simply confirms the common sense notion that statements such as the one contained in the solicitation letter are not relied upon by consumers, because they recognize that this genre of statements are not representations of fact. Accordingly, Berner's statement in the solicitation letter that his proposed transaction would entail "little if any risk," cannot be regarded as a misrepresentation actionable under the VCPA.

### C. Did the Conveyance Violate the Automatic Stay?

The final issue raised on this appeal is whether the transfer of the property on November 19, 2003 violated the automatic stay provision of 11 U.S.C. § 362(a)(3). This provision provides that a bankruptcy filing will stay, among other activities, "any act to obtain possession of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The record is clear that before Cooper signed the documents transferring title to his

home, the Order dismissing his case had been signed by the bankruptcy court, but not yet

docketed.  As the bankruptcy court correctly pointed out, Rule 9021, Fed. R. Bankr. P., provides

that an order is effective when entered on the docket, and that technically, the deed was signed

the day before the order dismissing the case was docketed and became effective, potentially

violating the stay.

The bankruptcy court, however, declined to find a violation of the stay on two bases.

First, the bankruptcy court found that because the bankruptcy plan had been confirmed, the

property had become vested in the debtor pursuant to 11 U.S.C. 1327(b).  The effect of § 1327(b)

on a Chapter 13 bankruptcy estate is a complicated issue which has produced a wide variance of

opinions.  *See In re Holden*, 236 B.R. 156, 161 (Bankr.D.Vt. 1999) (describing four different

lines of cases addressing this issue).  The bankruptcy court here adopted the position of *In re*

*Leavell*, 190 B.R. 536, 540 (Bankr.E.D.Va. 1995), which held that a post-confirmation estate

includes only that property necessary to make plan payments.[13]  Similarly, Collier's provides that

after confirmation of a plan pursuant to 11 U.S.C. § 1327(b), "the debtor is vested with the right

to control property of the estate, exclusive of the trustee, subject only to the debtor's obligations

under the plan with respect to that property." 8 *Collier on Bankruptcy* ¶ 1327.03[2] (Alan N.

Resnick & Henry J. Sommer eds., 15th ed. 2005).

The bankruptcy court noted, however, and the appellant chiefly relies upon, *In re*

---

[13]*See also In re Dickey*, 64 B.R. 3, 4 (Bankr.E.D.Va. 1985) ("[U]pon confirmation of debtor's Chapter 13 Plan, all property vested in the debtor and the estate was terminated."); *In re Walker*, 20 B.R. 372, 373 n.1 (Bankr.E.D.Va. 1982) ("The Trustee questioned whether a debtor has the right to dispose of real estate after confirmation of the Chapter 13 plan. Upon confirmation title to the property of the estate vests in the debtors. 11 U.S.C. s 1327(c). The Debtors had an unrestricted right to dispose of the real estate.").

*Reynard*, which rejected *Leavell's* distinction between the estate necessary for the success of the chapter 13 plan and property that is not necessary for the success of the plan as unworkable; *Reynard* held that all property enumerated under 11 U.S.C. § 1306(a) should be part of the post-confirmation chapter 13 estate.  *In re Reynard*, 250 B.R. 241, 248-49 (Bankr.E.D.Va. 2000).

Whether reliance on the *Leavell* opinion was misplaced need not be addressed, however, as the bankruptcy court cited an alternative ground for its finding that the stay was not violated, namely that transfers in violation of the stay are voidable, not void *ab initio*.  Neither the Supreme Court nor the Fourth Circuit has squarely addressed whether a transfer in violation of the stay is void or voidable.  *See Winters v. George Mason Bank*, 94 F.3d 130, 136 (4th Cir. 1996) (citing competing authority on this issue, but holding that the plaintiff "lacks standing to challenge the agreement as either void or voidable").  Courts addressing this issue have focused on whether the language of 11 U.S.C. § 362(d) allows a bankruptcy court to grant retroactive relief from the stay.  *See Khozai v. Resolution Trust Corp.*, 177 B.R. 524, 526 (E.D.Va. 1995). This provision of the bankruptcy code provides that "on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of the section, such as by terminating, annulling, modifying, or conditioning such stay . . . ." 11 U.S.C. § 362(d).  Courts that have construed this provision as allowing retroactive relief from an automatic stay have done so on the theory that the word "annulling" in the statute must allow for retroactive relief lest it lack any force distinguishable from the statute's grant of authority to "terminate" the stay.  *See Id.*; *In re Siciliano*, 13 F.3d 748, 751 (3d Cir.1994); *Sikes v. Global Marine, Inc.*, 881 F.2d 176, 178, *reh'g denied*, 888 F.2d 1388 (5th Cir. 1989); *In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir.1984).  As the Third Circuit explained in *Siciliano*:

> [T]he inclusion of the word 'annulling' in the statute, indicates a legislative intent to apply certain types of relief retroactively and validate the proceedings that would otherwise be void *ab initio*. . . . We note that, if such relief did not apply retroactively, then "its inclusion next to 'terminating' would be superfluous."

*Siciliano*, 13 F.3d at 751 (quoting *In re Albany Partners*, 749 at 675).  In addition to the

bankruptcy court's statutory authority to 'annul' the automatic stay, the Sixth Circuit premised its

decision that actions in violation of the stay are voidable on the bankruptcy court's ability to

grant an equitable exception to a stay.  *See Easely v. Pettibone Michigan Corp.*, 990 F.2d 905,

910-11 (5th Cir. 1993).

The Ninth Circuit, in *In re Schwartz*, 954 F.2d 569 (9th Cir. 1992), took the view that

transfers in violation of the stay are void, but that "§ 362 gives the bankruptcy court wide latitude

in drafting relief from the automatic stay, including the power to grant retroactive relief from the

stay." *Id.* at 572-73.  The result, as the district court in *Khozai* correctly pointed out, is the same.

*Khozai*, 177 B.R. at 527.  Collier's addressed this issue as follows:

> The use of the word "annulling" suggests that relief from the stay may operate retroactively.  This would validate actions taken by a party at a time when the party was unaware of the stay.  It appears that, although most courts hold that actions taken in violation of the stay are void, retroactive relief from the stay may be granted by annulling the stay.  Arguably, since a void action cannot be given effect through cure, the ability to ability to annul the stay retroactively may suggest that an action taken in violation is not void, but merely invalid.  In any event, it seems clear that a court has the power to validate actions taken in violation of the stay, either by viewing them as merely voidable or by annulling the stay retroactively.

3 *Colliers on Bankruptcy* ¶ 362.07[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. 2005).

Based on all these authorities, the bankruptcy court here was correct in holding that

whether a transfer in violation of the stay is deemed voidable or invalid but curable, the

bankruptcy court has the power to cure violations of the stay retroactively.  Having determined

that transfers are voidable, the bankruptcy court then held that "the circumstances here would not justify setting aside the transfer for what amounts at best to a technical violation of the automatic stay."  In essence, the bankruptcy court based its decision on (1) the fact that all of the parties involved in the transfer believed that the stay had been lifted once the dismissal order had been signed, and (2) the fact that the automatic stay provision's purpose of protecting the bankruptcy estate would not be defeated by the transfer since the bankruptcy estate would soon cease to exist.  Thus, the circumstances at bar made especially appropriate the exercise of the bankruptcy court's power to allow the transfer.

In sum, the bankruptcy court correctly concluded that the technical violation of the automatic stay[14] rendered the property transfer voidable, not void, and that, in the circumstances, there was good cause to allow the transfer.

For the foregoing reasons, the decision of the Bankruptcy Court must be affirmed.  An appropriate order will issue.

| | |
|---|---|
| | _____/s/_____ |
| Alexandria, VA | T. S. Ellis, III |
| December 7, 2005 | United States District Judge |

---

[14]The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109-8, effective October 17, 2005, is inapplicable to this case, as it was filed before the effective date of the new Act. See Pub.L. No. 109-8, § 1406(b)(1) ("the amendments made by this title shall apply only with respect to cases commenced under title 11 of the United States Code on or after the date of the enactment of this Act."  *See In re Myers*, 2005 WL 2671380, *10(E.D.Pa. 2005).